1 | UNITED STATES OF AMERICA,

2 |                   Plaintiff,

3 |              v.

4 | JAMES CHRISTOPHER CASTLE,

5 |                   Defendants.

CASE NO. 2:15-CR-190 GEB



**FILED**

MAR 1 0 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
           DEPUTY CLERK

## AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION OF JAMES CHRISTOPHER CASTLE

I, Audrey B. Hemesath, hereby being duly sworn, state that:

1. I am a citizen of the United States and a resident of the state of California.

2. I submit this affidavit in support of the request by the United States for the extradition of James Christopher Castle (Castle), also known as "Chris Castle" and "James Castro", from Australia to the United States for the purpose of prosecuting him on the charges contained in the indictment filed in the U.S. District Court for the Eastern District of California in Criminal Case No. 2:15-CR-190 GEB, charging Castle with bank fraud, money laundering, conspiracy, and false making of documents.

3. This affidavit is organized as follows:

    Part I: contains a recitation of my background and experience in the area of criminal prosecution in the United States, as well as a brief description of my duties and responsibilities as an Assistant United States Attorney.

    Part II: sets forth the facts supporting the indictment filed in Criminal Case No. 2:15-CR-190 GEB, relating to unlawful activity engaged in by Castle.

    Part III: sets forth the law and the charges pertaining to the indictment filed in Criminal Case No. 2:15-CR-190 GEB, relating to unlawful activity engaged in by Castle. It is subdivided as follows:

        (A) Charging Process;

(B) Procedural History of the Case;

(C) Identification of Offenses and Penalties;

(D) Elements of the Offenses Charged;

(E) Statute of Limitations; and

(F) Status of the Case.

<u>Part IV</u>: sets forth descriptive information relating to Castle.

<u>Part V</u>: is an index and certification of the exhibits attached to this affidavit.

**Part I**

**<u>Legal Background</u>**

4.   I graduated from the Georgetown University Law Center in May 2000, and was admitted to the California State Bar in April 2001.  From September 2001, to the present, I have been employed by the United States Department of Justice, first as a trial attorney in the Office of Immigration Litigation, and then as an Assistant United States Attorney for the Eastern District of California.  My duties, among others, are to prosecute persons charged with criminal violations of the laws of the United States. During my tenure as an Assistant United States Attorney, I have become knowledgeable about the criminal laws and procedures of the United States.

5.   In the course of my duties, I have become familiar with the charges and evidence in the case of *United States v. Castle* (2:15-CR-190 GEB).  These charges arose out of an investigation by the Federal Bureau of Investigation (FBI), which revealed that between in or about April 22, 2010, and November 18, 2011, Castle conspired with others to perpetuate a "mortgage elimination program" in which distressed homeowners were recruited with the promise of relief from foreclosure and the protection of two spiritual organizations: (1) Shon-te-East-a, Walks with Spirit, and (2) the Pillow Foundation.  Castle caused the creation and recording of fraudulent documents—fictitious deeds of trust, falsely made deeds of reconveyance, and falsely made notices of rescission of notice of default—which gave the misimpression that the legitimate lenders on the homeowners' properties had been repaid, and that the

2

only debt owing was to an entity controlled by one or more members of the conspiracy. Castle directed his co-conspirators to then cause the sale of the homes, dividing the profits among themselves and to their personal benefit.

## Part II
### Factual Basis

6. Castle was the co-owner of the entity CCTT Group, an unincorporated company dedicated to what the founders of the company called the "administrative default process" or alternatively the "mortgage elimination program." Tisha Trites (Trites) formed the second half of CCTT (which stands for "Chris Castle Tisha Trites"), and was an organizer of the entire "mortgage elimination program." CCTT maintained a bank account, named CCTT Legal, at Bank of America in South Lake Tahoe, California, in the Eastern District of California. Castle was a signatory to this bank account, and he used this account to receive and disburse funds in furtherance of the conspiracy.

7. Castle was also the owner of Oreplex International, LLC, which he held out as a private lending company for the purposes of the scheme. Oreplex maintained a bank account at Bank of America, for which Castle was a signatory. Castle used this account to receive and disburse funds in furtherance of the conspiracy.

8. Todd Smith (Smith) was a co-conspirator of Castle and Trites. He represented himself to be a private lender on at least two properties that were sold through the scheme.

9. Laura Marie Pezzi (Pezzi), another co-conspirator, sold her own home through the "mortgage elimination program," and then began to work out of her house as an administrator for the scheme, managing the documents and document templates used in furtherance of the conspiracy.

10. George Larsen (Larsen), another co-conspirator, was affiliated with the SGA Group and the GJZ Group, which were held out as private lenders for the purposes of the scheme. Larsen also recruited homeowners into the mortgage elimination program.

11. Between April 2010 and November 2011, Castle tasked his co-conspirators with identifying distressed homeowners who fit a certain profile: their property value was less than the amount owed to the mortgage lender, and they were in danger of foreclosure, but foreclosure was not

1    quite imminent.

2        12.    The co-conspirators recruited homeowners at seminars held in Roseville, California, and
3    Petaluma, California, and elsewhere. In these seminars, Castle and others explained the "administrative
4    default procedure" or "mortgage elimination program" to the homeowners.

5        13.    Castle and others enticed the homeowners with the promise of three things: an
6    opportunity to avoid foreclosure and the resulting negative impact on their credit; a possible tax write-
7    off when the home was ostensibly donated to the church; and some percentage of the sales proceeds,
8    typically 20% of the short sale profit. However, a key component of the scheme was that homeowners
9    were not given the option of remaining in their homes. The co-conspirators required that each
10   homeowner agree to sell the home to participate in their fraudulent "mortgage elimination program."

11       14.    Homeowners committing to the program typically signed a contract with the individual
12   who recruited them into the program and Castle. Homeowners also typically signed a membership
13   application into the Shon-te-East-a church or the Pillow Foundation, among other documents. Co-
14   conspirator John Michael DiChiara (DiChiara) named himself the archbishop of Shon-te-East-a and of
15   the Pillow Foundation. DiChiara claimed that, as archbishop, he helped individuals spiritually by
16   alleviating them from personal debt, namely, their mortgage loans. Both Shon-te-East-a and Pillow
17   Foundation claimed to be tax exempt religious organizations. However, neither organization had a
18   physical worship location.

19       15.    A typical aspect of the scheme was the requirement that the homeowners assign or
20   convey their homes to Shon-te-East-a or the Pillow Foundation. This assignment gave the homeowners
21   the impression they were making a charitable donation to a religious organization, toward the possible
22   end of taking a tax deduction. The assignment also gave the co-conspirators the assurance that once the
23   co-conspirators had fraudulently filed documents to purport to eliminate the preexisting lien(s) on the
24   house, the homeowner would not sell the house to a third party and keep the proceeds. In some
25   instances, the homeowners actually recorded a quitclaim deed[1] (or equivalent document, depending on
26   jurisdiction), deeding their interest in the house to Shon-te-East-a or Pillow Foundation. In other

27

28   [1] A quitclaim deed is an instrument used to transfer an interest in real property.

4

1   instances, the co-conspirators simply maintained a copy of a notarized, fully executed assignment, the
2   purpose of which was to give the homeowners the impression that Shon-te-East-a or Pillow Foundation
3   now held the property.  In certain instances, certain co-conspirators also gave homeowners the
4   misimpression that the quitclaim or assignment transferred to Shon-te-East-a or Pillow Foundation legal
5   responsibility over the mortgage(s) on the property.  In reality, responsibility to repay the loan(s) to the
6   financial institution(s) remained with the homeowners at all times.

7          16.    Castle and others then caused the creation and recording of a sham lien on the property.
8   They identified entities they controlled— including CCTT and Oreplex International—as the new lender
9   on the property.  They selected an arbitrary amount to fill in for the bogus new loan, always higher than
10  the original, real loan amount, to give the illusion that the property had been refinanced.  But in fact, the
11  bogus lien did not secure any real loan and the homeowners understood that they owed no money to the
12  lenders listed on the fictitious liens.  Castle and others caused the recording of the fraudulent deeds of
13  trust reflecting these bogus liens at the office of the county recorder.

14         17.    Castle and others were then responsible for the fraudulent reconveyance of the property
15  from the financial institution(s) that actually held the mortgage.  As part of the conspiracy, they created
16  a fraudulent deed of reconveyance (or equivalent document, depending on jurisdiction).  This document
17  purported to extinguish the real lending institution's security interest in the subject property.  A real,
18  trusted person, using their real name and signature, was used to sign the fraudulent deed of
19  reconveyance as if the trusted person was an authorized representative of the financial institution that
20  actually held the mortgage.  The fraudulent deeds of reconveyance were then recorded at the county
21  recorder's office.  The fraudulent deeds were sent to the purported beneficiary of the reconveyance from
22  the recorder's office via U.S. mail.

23         18.    The financial institutions were unaware that the fraudulent deeds of reconveyance had
24  been recorded, because the mailing notification in most instances went directly to the homeowner.  In
25  addition, on some occasions, homeowners were instructed to or required to sign a confidentiality
26  agreement, keeping secret the mechanics of the "mortgage elimination program."

27         19.    In many instances, the financial institution(s) that actually held the mortgage recorded a
28  notice of default, marking the beginning of the foreclosure process.

1    20.    In many instances, certain co-conspirators, made aware of the issuance of a notice of
2  default, caused a fraudulent Notice of Rescission of Notice of Default to be recorded. A notice of
3  rescission causes the notice of default to become unenforceable, and the lender would be unable to
4  proceed with foreclosure. As with the fraudulent deeds of reconveyance, the notices of rescission of
5  default were signed by real persons known to the co-conspirators who purported to be "authorized
6  representatives" of the financial institution(s) that were actually in the process of foreclosing on the
7  home. These notices of rescission were recorded and typically sent to the homeowner via U.S. mail.

8    21.    Since the notices of rescission erased the default notice and the properties appeared free
9  and clear to sell, the homes were then put up for sale. Once in escrow, the co-conspirators, holding
10  themselves out as CCTT and other fictitious lenders, acted as the lender who was purportedly still owed
11  money, and typically sent to the escrow agent a demand letter approving the short sale of the property.
12  The fictitious lender approved a short sale amount that was typically just a fraction of the bogus loan
13  amount stated in the fraudulent deed of trust recorded just a few months earlier.

14    22.    The result of the recorded fraudulent deeds of trust, fraudulent deeds of reconveyance,
15  and fraudulent notices of rescission of notice of default was to deceive the escrow agent and to make it
16  appear as though CCTT, Oreplex and other fictitious lenders were the primary lienholders on the
17  property and the legitimate lenders had no valid security interest in the property and did not need to be
18  paid at closing. Escrow agents therefore caused payments to CCTT and other fictitious lenders as part
19  of these closings.

20    23.    Castle and others received funds from the short-sale closings as the fictitious lender.
21  Castle and his co-conspirators split the proceeds according to prearranged agreement. As a leader of the
22  conspiracy, Castle received a greater share of the proceeds.

23    24.    The real liens on the property by the financial institutions were never satisfied by the
24  fraudulent short sale of the home. In many instances, the financial institutions continued the foreclosure
25  process. In many instances, the buyers of the homes became aware of the clouded title to the home for
26  the first time when the financial institutions attempted to foreclose on the properties after the fraudulent
27  short sale.

28    25.    In all, Castle and his co-conspirators sold approximately 37 properties in furtherance of

6

1   the conspiracy. The sale proceeds totaled in excess of $8 million USD. In addition, they put
2   approximately 97 other properties through some phase of the "mortgage elimination program," toward
3   the end of eventual sale. The legitimate loans they sought to fraudulently extinguish totaled in excess of
4   $60 million USD.

5           26.     For example, Castle participated in the sale of property located at 1928 Sansone Drive,
6   Santa Rosa, California. The homeowner is expected to testify that he enrolled in the mortgage
7   elimination program after speaking with Castle. Castle told Ramsey that the process would be easier
8   since Ramsey was already moved out of the Sansone property. The homeowner signed a series of
9   documents, including a membership application to Shon-te-East and an Assignment of his property to
10  Shon-te-East. The homeowner also signed a Deed of Trust falsely indicating that he owed GJZ Group
11  $425,000, secured against the Sansone Drive property. The homeowner is expected to testify that he
12  never received a mortgage loan or a mortgage refinance with GJZ Group; signing the deed of trust was
13  just part of the process. The homeowner is expected to testify that the mortgage elimination program
14  kept changing and that he was required to sign more and more documents. However, each time he
15  wanted to pull out, Castle would talk him into staying. On or about October 1, 2010, DiChiara, Castle,
16  and Larsen caused a Substitution of Trustee and Deed of Reconveyance to be recorded, purporting to
17  convey lienholder Bank of America's interest in the Sansone drive property, as the debt had been fully
18  repaid. The Deed of Reconveyance was signed by an individual who did not work for Bank of America
19  and was not an authorized representative. Bank of America did not reconvey its interest in the property
20  to the homeowner. On or about October 1, 2010, DiChiara, Castle and Larsen caused a second
21  Substitution of Trustee and Deed of Reconveyance to be recorded, purporting to reconvey Chase Home
22  Finance's interest in the Sansone Drive property as the debt had been fully repaid. The Deed of
23  Reconveyance was signed by an individual who did not work for Chase and was not an authorized
24  representative. The individual who signed this deed of reconveyance is expected to testify that he was
25  acquainted with Castle and Larsen and signed because he trusted Larsen. Castle, DiChiara and Larsen
26  then caused the sale of the property for $97,492.99. A spreadsheet maintained by Trites indicated that
27  Castle's entity CCTT was to have received a share of the sale totaling approximately one-third of the
28  sale price. And in fact, just over that amount, $42,497.17 was sent to the CCTT bank account on the

1 | same day as the Sansone Drive sale.

## Part III
## The Charges and Pertinent United States Law

### A.   The Charging Process

27.     Under the federal law of the United States, a criminal prosecution is commenced when a grand jury files an indictment.  Institutionally, a grand jury, though an arm of the court, is an independent body composed of private citizens — not less than 16 and not more than 23 people — whom the United States District Court selects at random from the residents of the judicial district in which the court resides.  The purpose of the grand jury is to review the evidence of crimes presented to it by United States law enforcement authorities.  After independently reviewing this evidence, each member of the grand jury must determine whether there is probable cause to believe that a crime has been committed and that a particular person committed that crime.  If at least 12 jurors find that the evidence they have reviewed provides probable cause to believe that a particular person committed the crime, the grand jury may return an indictment.  An indictment is a formal written accusation that charges the particular person, now a defendant, with a crime, identifies the specific laws that the defendant is accused of violating, and specifies the date and place where the charged crime occurred.

28.     The grand jury initiates the criminal prosecution when it files the indictment with the United States District Court.  Thereafter, after the filing of the indictment, the clerk of the court, at the direction of a United States District Judge or Magistrate Judge, normally issues a warrant for the defendant's arrest.

29.     In addition to imprisonment and a criminal fine, depending on the charged offense, U.S. law provides for the seizure and forfeiture of the defendant's property that constitutes the proceeds of the offense or that facilitates such offense.  A criminal forfeiture may be alleged in an indictment, and merely provides the defendant with notice of the government's intention to forfeit property associated with the offense.  If specific property is listed in the forfeiture allegation, the grand

8

jury must find probable cause to believe that the property is forfeitable. Upon a showing of probable cause, a United States District Court Judge or Magistrate Judge may issue a seizure warrant for the seizure of the property.

**B.   Procedural History of the Case**

30.     On September 10, 2015, a grand jury sitting in the Eastern District of California returned an indictment charging Castle with criminal offenses in violation of the laws of the United States and filed the indictment with the United States District Court for the Eastern District of California. It is the practice of the United States District Court for the Eastern District of California to retain the original indictment and file it with the records of the court. Therefore, I have obtained a copy of the indictment, certified as true and accurate, from the clerk of the court, and have attached it to this affidavit as **Exhibit 1**.

31.     On September 10, 2015, based on the indictment filed by the grand jury, and with the approval of the United States District Court for the Eastern District of California, Kimberly Zignago, the deputy clerk of the court, signed an arrest warrant for Castle. Pursuant to Rule 9 of the Federal Rules of Criminal Procedure, the clerk of the court is the authority competent to sign arrest warrants and deliver them for execution to law enforcement authorities competent to make arrests. A copy of Rule 9 is attached to this affidavit as **Exhibit 2**. It is the practice of the United States District Court for the Eastern District of California to retain the original arrest warrant and file it with the records of the court. Therefore, I have obtained a copy of the arrest warrant, certified as true and accurate, from the clerk of the court and have attached it to this affidavit as **Exhibit 3**.

**C.   Identification of Offenses and Penalties**

32.     The indictment charges that Castle and others committed the following offenses:

| | |
|---|---|
| Count 1: | Conspiracy to Commit Bank Fraud and False Making of Lending Agency Writings, in violation of Title 18, United States Code (U.S.C.) Section 371, carrying a maximum penalty of 5 years imprisonment; |
| Counts 2-16: | Bonds and Obligations of Certain Lending Agencies, in violation of 18 U.S.C. § 493, carrying a maximum penalty of 10 years imprisonment; |

9

| | |
|---|---|
| Counts 17-39: | Bank Fraud, in violation of 18 U.S.C. § 1344(1), carrying a maximum penalty of 30 years imprisonment; |
| Count 40-42: | Transactions in Criminally Derived Property, in violation of 18 U.S.C. § 1957, carrying a maximum penalty of 10 years imprisonment; |

33.     The United States requests the extradition of Castle for the offenses enumerated in counts 1-26, 29-39, and 42 but not for the offenses enumerated in counts 27, 28, 40, and 41, which do not name Castle as a defendant.  Each count charges a separate offense.  Each of the offenses is punishable under a statute that (1) was the duly enacted law of the United States at the time the offense was committed, (2) was the duly enacted law of the United States at the time the indictment was filed, and (3) is currently in effect.   Each offense is a felony offense and is punishable under United States law by a term of imprisonment.  I have attached a copy of the pertinent sections of these statutes, including the applicable penalty provisions, as **Exhibit 4.**

**D.  Elements of the Offenses**

34.     Count one charges Castle with conspiracy, in violation of 18 U.S.C. § 371.  Under U.S. law, a conspiracy is simply an agreement to commit one or more criminal offenses.  The agreement on which the conspiracy is based need not be written or even verbal.  It may be simply a tacit understanding by two or more persons to do something illegal.  The conspirators enter into a partnership for a criminal purpose in which each member or participant becomes a partner or agent of every other member.  A person may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the identities of all the other members of the conspiracy.  If a person has an understanding of the unlawful nature of a plan and knowingly and willfully agrees to it, joining in the plan is enough to convict him of conspiracy even though he did not participate from the beginning to the end of the conspiracy and may play only a minor part.  In fact, a conspirator can be held criminally responsible for all reasonably foreseeable actions undertaken by other conspirators in furtherance of the criminal partnership.  Moreover, because of this partnership, statements made by a conspirator in the course of

and while he is a member of the criminal conspiracy are admissible in evidence not only against that conspirator, but also against all other members of the conspiracy. This is so because, as stated earlier, a conspirator acts as an agent or representative of the other conspirators when he is acting in furtherance of their illegal scheme. Therefore, statements of conspirators made in furtherance of the conspiracy may be deemed to be the statements of all conspirators.

35.    The crime of conspiracy is an independent offense, separate and distinct from the commission of any specific "substantive crime." Consequently, a conspirator can be found guilty of the crime of conspiracy to commit an offense even where the substantive crime that was the purpose of the conspiracy is not committed. The Congress of the United States has deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the conspiracy is not successful, because collective criminal planning poses a greater threat to public safety and welfare than individual conduct and increases the likelihood of success of a particular criminal venture.

36.    To satisfy its burden of proof and convict Castle of conspiracy to commit bank fraud and false making of lending agency writings, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) that two or more persons entered into an unlawful agreement to commit bank fraud and false making of lending agency writings; (2) that Castle knowingly and willfully became a member of the conspiracy to commit those crimes; and (3) that one of the members of the conspiracy committed at least one overt act for the purpose of carrying out the conspiracy. The United States will establish these three elements at trial by, among other things, presenting the testimony of two cooperating witnesses – specifically, Trites and Smith.[2] Trites, who formed CCTT with Castle, was an organizer of the entire mortgage elimination program and has knowledge of Castle's role in leading the scheme. Smith has knowledge that Castle was never a real

_____

[2] Trites and Smith both pleaded guilty to charges on September 4, 2015. Trites pleaded guilty to one count of false writings, in violation of 18 U.S.C. § 493. Smith pleaded guilty to one count of conspiracy, in violation of 18 U.S.C. § 371.

lender and that the deeds of trust filed on the properties were fictitious. The testimony of Trites and Smith will be corroborated by the documents filed at the county recorder's office, including the fictitious deeds of trust, the falsely made deeds of reconveyance, and the false notices of rescission of notice of default. The fictitious deeds of trust are also proved false by the expected testimony of the homeowners, who never owed any real debt to Castle, and of the other co-conspirators, or their entities. The falsely made deeds of reconveyance and notices of rescission of notice of default are proved false by confirmation from the financial institution that the individual signing the deed had no affiliation with the financial institution, nor the authority to sign and the expected testimony of the individuals signing the deed. In addition, documentary proof is found in the escrow company files, including demand letters from the co-conspirators requesting payment on the sale of the house. Further proof of Castle's leadership will be emails between co-conspirators. Finally, bank records will prove the receipt of sales proceeds.

37.     Counts 2-16 charge Castle with false making of lending association writings, in violation of 18 U.S.C. §§ 493 and 2. Under U.S. law, a person who aids and abets the commission of a crime – in this instance, false making of lending association writings – is as guilty as the person who actually performs the criminal act. 18 U.S.C. § 2. Under the "aiding and abetting" laws of the United States, the guilt of a defendant in a criminal case may be proven without evidence that the defendant personally did every act involved in the commission of the crime charged. The law recognizes that, ordinarily, anything a person can do for himself may also be done through an agent, or by acting together with, or under the direction of, another person or persons in a joint effort. Accordingly, if the defendant willfully directs or authorizes an agent or associate to commit a crime or willfully joins another person in the commission of a crime then the law holds the defendant responsible for the conduct of the other person.

38.     To satisfy its burden of proof and convict Castle of aiding and abetting false making of lending association writings, the government, at trial, must establish beyond a reasonable doubt each of

the following essential elements: (1) that a person falsely made a writing; (2) said writing was an imitation of a writing issued by a lending association authorized or acting under the laws of the United States; (3) the defendant knowingly and intentionally aided, counseled, commanded, induced, or procured that person to commit each element of the false making of the writing; and (4) the defendant acted before the crime was completed.

39.     The United States will establish these four elements at trial through, among other things, documents from the county recorder's office (deeds of reconveyance and notices of rescission of notice of default), the expected testimony of the individuals who had signed the falsely made documents, and the testimony of a real representative of the lending association, templates and versions of the falsely made deeds of reconveyance and notices of rescission of notice of default discovered on Pezzi's[3] home computer, and the testimony of cooperating witness Trites, and Castle's emails.

40.     The evidence will show that Castle aided and abetted the false making of the following recorded documents. Trites is expected to testify that Castle was the originator of the mortgage remedy program and brought her and DiChiara[4] in to form the leadership of the group. Trites is expected to testify that Castle explained to her the idea that a substitution of trustee and deed of reconveyance was an essential part of the program. Although Castle likely did not himself file the following recorded documents, he intended for the people beneath him in the scheme to record the falsely made documents, towards the end goal of the eventual sale of the house through the mortgage remedy program, which was to his benefit as he received funds from the sale of each of these properties. For example, on October 8, 2012, Castle emailed someone affiliated with the scheme and copied Trites and Larsen[5] on the email:

---

[3] Pezzi was arrested on September 24, 2015, and charged with violations of Title 18 U.S.C. §§ 371 and 493.
[4] DiChiara was arrested on September 25, 2015, and charged with violations of Title 18 U.S.C. §§ 371, 493, 1344, and 1957.
[5] Larsen was arrested on October 1, 2015, and charged with violations of 18 U.S.C. §§ 371 and 1344. Also charged in the same indictment as Castle, Pezzi, DiChiara, and Larsen were Remus Kirkpatrick, Larry Todt, and Michael Romano. Kirkpatrick was arraigned on October 19, 2015, and charged with violations of 18 U.S.C. §§ 371, 493, 1344, and 1957. Todt made his initial appearance on February 10, 2016, and he is charged with violations of 18 U.S.C. §§ 371 and 1344. Romano was arrested on September 24, 2015, and charged with violations of 18 U.S.C. §§ 371 and 493.

"Tulane and Canyon Rd . . . . am I correct in making the conclusion that George [Larsen] had you execute documents?  If so, in what capacity did you act?  If you acted as Authorized Representative of the financial institution, did he get to you the POA with hold harmless agreement executed by the homeowner for your benefit?  Were you a notary?"  The "Authorized Representative" Castle refers to is the person who is signing the falsely made document as if he is employed by the real lender, but in reality is not employed by the real lender and is not an authorized representative.  Filing falsely made substitutions of trustee and deeds of reconveyance and notices of rescission of notice of default were an essential part of the scheme that Castle conceived.  For example, On November 1, 2012, after learning of Trites' cooperation with the FBI, Castle emailed Trites and two other individuals affiliated with the scheme, and stated "[t]he only aspect of the entire process that is even under scrutiny with any agency are the filings done at the county . . ."  Here, Castle is referring to the falsely made recorded documents: the deeds of trust, deeds of reconveyance, and notices of rescission of notice of default.  This email is inculpatory as it shows his knowledge that the recorded documents are at the heart of the fraud scheme.  Castle intended to have falsely made recorded documents filed in every property in the scheme, and he assisted in the filing of the falsely made documents by developing the mortgage remedy program and central to that were the falsely made recorded documents.  The specific falsely made recorded documents charged in the indictment are as follows:

| Count | Property | False Document | Place of Filing | Date of Filing |
|---|---|---|---|---|
| 2 | 3182 Shawnee Court, Cameron Park, California | Substitution of Trustee and Deed of Reconveyance | El Dorado County | December 3, 2010 |
| 3 | 3182 Shawnee Court, Cameron Park, California | Substitution of Trustee and Deed of Reconveyance | El Dorado County | December 2, 2010 |

| | | | | |
|---|---|---|---|---|
| 4 | 319 Marsalla Drive, Sacramento, California | Substitution of Trustee and Deed of Reconveyance | Sacramento County | February 15, 2011 |
| 5 | 319 Marsalla Drive, Sacramento, California | Substitution of Trustee and Deed of Reconveyance | Sacramento County | March 1, 2011 |
| 6 | 6303 Green Garden Drive, Bakersfield, California | Substitution of Trustee and Deed of Reconveyance | Kern County | October 4, 2010 |
| 7 | 6303 Green Garden Drive, Bakersfield, California | Substitution of Trustee and Deed of Reconveyance | Kern County | September 30, 2010 |
| 8 | 1420 Roaring Camp Court, Plumas Lake, California | Substitution of Trustee and Deed of Reconveyance | Yuba County | December 22, 2010 |
| 9 | 7593 Almondwood Avenue, Citrus Heights, California | Substitution of Trustee and Deed of Reconveyance | Sacramento County | October 20, 2010 |
| 10 | 5479 Dunlay Drive, Sacramento, California | Substitution of Trustee and Deed of Reconveyance | Sacramento County | September 21, 2010 |
| 11 | 7233 Cromwell Drive, Sacramento, California | Notice of Rescission of Notice of Default | Sacramento | October 14, 2010 |
| 12 | 7233 Cromwell Drive, Sacramento, California | Substitution of Trustee and Deed of Reconveyance | Sacramento | October 14, 2010 |
| 13 | 7233 Cromwell Drive, Sacramento, California | Substitution of Trustee and Deed of Reconveyance | Sacramento | October 15, 2010 |
| 14 | 2162 Painted Pony Road, Somerset, California | Substitution of Trustee | El Dorado County | February 14, 2011 |

| | | | | |
|---|---|---|---|---|
| 15 | 2162 Painted Pony Road, Somerset, California | Full Reconveyance | El Dorado County | February 14, 2011 |
| 16 | 2162 Painted Pony Road, Somerset, California | Notice of Rescission of Notice of Default and Election to Sell Under Deed of Trust | El Dorado County | March 4, 2011 |

41.     Counts 17-26 and 29-39 charge Castle with bank fraud, in violation of Title 18, U.S.C., §

1344(1).  To satisfy its burden of proof and convict Castle of bank fraud, the government, at trial, must

establish beyond a reasonable doubt each of the following essential elements:  (1) that the defendant

knowingly executed or attempted to execute a scheme to defraud a financial institution; and (2) that the

defendant did so with the intent to defraud.  The United States will establish these two elements through,

among other things, the falsely made deeds of reconveyance and notices of rescission of intent to default

filed on each of the properties listed below, Castle's emails, the expected testimony of the homeowners

who participated in the mortgage elimination program, the expected testimony of cooperating witness

Trites, and the evidence from the escrow files indicating that the effect of the falsely made documents

was to give the impression that the homeowners no longer owed any mortgage to the legitimate lenders.

42.     The evidence will establish that Castle committed bank fraud by causing the filing of the

deeds of reconveyance listed below with the intent to extinguish the legitimate loans held by the real

lenders on the properties.  Trites is expected to testify that Castle told her that an essential part of the

mortgage remedy program was defaulting a homeowner's lender.  According to Castle, to default the

lender, a series of documents would be submitted to a homeowner's lender requesting that the lender

reconvey their current mortgage note and/or deed of trust back to the homeowner.  According to Castle,

if the lender failed to respond to the mortgage remedy program documents, then the lender essentially

agreed to the terms of the mortgage remedy program documents.  According to Castle, a person then

associated with the group could sign the substitution of trustees and deeds of reconveyance as though

they were an "authorized representative" of the lender and release/reconvey the lender's security

interest.  Castle knowingly executed this scheme to defraud, with the intent to defraud, the following

lenders:

| Count | Property | Loan Amount | Financial Institution | Place and Approximate Date of Recording of Deed of Reconveyance |
|---|---|---|---|---|
| 17 | 319 Marsalla Drive, Folsom, California | $311,500 | World Savings Bank/Wells Fargo | Sacramento County, February 15, 2011 |
| 18 | 319 Marsalla Drive, Folsom, California | $20,000 | World Savings Bank/Wells Fargo | Sacramento County, March 1, 2011 |
| 19 | 1928 Sansone Drive, Santa Rosa, California | $308,000 | Bank of America | Sonoma County, October 1, 2010 |
| 20 | 1928 Sansone Drive, Santa Rosa, California | $77,000 | JP Morgan Chase | Sonoma County, October 1, 2010 |
| 21 | 6303 Green Garden Drive, Bakersfield, California | $300,000 | M&T Mortgage/Bank of America | Kern County, October 4, 2010 |
| 22 | 6303 Green Garden Drive, Bakersfield, California | $95,000 | RBS Citizens/Charter One Bank | Kern County, September 30, 2010 |
| 23 | 564 Stone Drive, Novato, California | $767,200 | Bank of America | Marin County, February 18, 2011 |
| 24 | 564 Stone Drive, Novato, California | $100,000 | Citibank | Marin County, February 18, 2011 |
| 25 | 4137 Loch Dane Court, Antelope, California | $360,000 | GMAC/SCME Mortgage Bankers/Aurora Loan Services | Sacramento County, April 22, 2010 |
| 26 | 1420 Roaring Camp Court, Olivehurst, California | $275,000 | Fidelity Home Mortgage/Bank of America | Yuba County, December 22, 2010 |

| 29 | 7233 Cromwell Way, Sacramento, California | $301,500 | Encore Credit/Chase Bank | Sacramento County, October 14, 2010 |
| 30 | 7233 Cromwell Way, Sacramento, California | $59,000 | Liberty American Mortgage/HSBC Bank | Sacramento County, October 15, 2010 |
| 31 | 28432 Avenida Placida, San Juan Capistrano, California | $999,000 | JP Morgan Chase (formerly Washington Mutual) | Orange County, April 28, 2010 |
| 32 | 21029 Justco Lane, Castro Valley, California | $528,000 | SCME Mortgage Bankers | Alameda County, March 25, 2011 |
| 33 | 60 Canyon Drive, Fairfax, California | $574,000 | Deutsche Bank/ PNC Bank | Marin County, March 22, 2011 |
| 34 | 7593 Almondwood Avenue, Citrus Heights, California | $240,500 | JP Morgan Chase | Sacramento County, October 20, 2010 |
| 35 | 3765 Northcrest Court, Simi Valley, California | $444,000 | United Capital Funding/Bank of America | Ventura County, January 19, 2011 |
| 36 | 3765 Northcrest Court, Simi Valley, California | $27,750 | Bank of America | Ventura County, January 19, 2011 |
| 37 | 5479 Dunlay Drive, Sacramento, California | $396,000 | Deutsche Bank/Bank of America/ Countrywide | Sacramento County, September 21, 2010 |
| 38 | 154 Brook Court, Branson, Missouri | $161,029 | JP Morgan Chase/First Choice Funding | Taney County, January 18, 2011 |
| 39 | 1794 Kodiak Circle, Reno, Nevada | $452,800 | World Savings/Wachovia | Washoe County, May 20, 2011 |

43.     Count 42 charges Castle with transactions in criminally derived property, in violation of 18 U.S.C. § 1957. To satisfy its burden of proof and convict Castle of transactions in criminally derived property, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) the defendant knowingly engaged or attempted to engage in a monetary transaction; (2) the defendant knew the transaction involved criminally derived property; (3) the property had a value greater than $10,000; (4) the property was, in fact, derived from a specified unlawful activity (in this instance, bank fraud); and (5) the transaction occurred in the United States. The United States will prove beyond a reasonable doubt that Castle engaged in a monetary transaction, specifically, the purchase of a $20,000 Bank of America cashier's check payable to the J. Christopher Castle Irrevocable Trust, on or about June 14, 2011. The value of the cashier's check was greater than $10,000. The $20,000 was derived from bank fraud, specifically, the false documents, title fraud, and sale of the property located at 21029 Justco Lane, Castro Valley, California (the Justco Lane house).

44.     The homeowner of the Justco Lane house is expected to testify that she was introduced to the Shon-te-East-a church and the mortgage elimination program by Larsen. Larsen introduced the homeowner to DiChiara, Castle, and Trites. The homeowner attended a meeting in Burlingame, California with approximately 100 other people in attendance and heard Castle speak about the mortgage elimination program. Larsen had the homeowner sign a deed of trust indicating that SGA Group held a $624,000 mortgage on her property. Larsen reassured her that she did not in fact owe $624,000 to SAG Group. Larsen, Trites, Castle, and DiChiara then caused to be filed a falsely made deed of reconveyance at the Alameda County Recorder's Office. Meanwhile, the legitimate lienholder filed a notice of default, initiating foreclosure proceedings. In response, Castle, Trites, DiChiara, and Larsen caused the filing of a falsely made notice of rescission of the notice of default. Larsen, Castle, Trites and DiChiara then caused the sale of the home; the home sold for approximately $321,446.

45.     An FBI analyst is expected to testify that the $20,000 cashier's check charged in the

money laundering count is traceable to the sale proceeds from the Justco Lane house. Castle knew the $20,000 was derived from bank fraud. An estimated sales proceeds spreadsheet prepared in advance of the sale by one of the co-conspirators indicated that Castle's entity, CCTT, was to receive approximately $115,549.84 as a share of the sale of the house. In fact, bank records demonstrate that $116,299.84 was transferred to the CCTT Group Bank Account on June 14, 2011. Bank records show that on June 14, 2011, Castle purchased the $20,000 cashier's check using funds from the CCTT Group Bank of America bank account. Bank records show that this transaction took place in the United States.

## E.  Statute of Limitations

46.     The statute of limitations applicable to the offenses charged in count 1, 2-16, and 40-42 of the indictment is 18 U.S.C. § 3282(a), which allows prosecution to commence within five (5) years after an offense is committed. The statute of limitations applicable to the offense charged in counts 17-26 and 29-39 is 18 U.S.C. §3293, which allows prosecution to commence within ten (10) years after an offense is committed. I have attached a copy of these statutes to this affidavit as **Exhibit 5**. The indictment is dated September 10, 2015, and charges offenses that occurred between April 2010 and November 2011, within the prescribed time.

## F.  Status of the Case

47.     Castle was indicted by a federal grand jury on September 10, 2015. During the course of the investigation, Castle, his wife Lara Castle, and their children moved to New Zealand. It is unknown if Castle was aware of the investigation at the time of his departure from the United States. Castle arrived in New Zealand originally on a ninety (90) day visitor's visa. At some point, Castle was granted a work visa valid up to January 31, 2014. Castle and his wife had another child born in New Zealand on June 11, 2012. After being denied a visa extension, Castle and his wife arrived in Australia on August 23, 2014, on a ninety (90) day visitor's visa with their four children.

48.     Castle has been indicted in a separate case in the Northern District of California Docket

No. 14-CR-388. Castle is aware of that indictment, having caused a seventy-five (75) page document to be filed with the United States District Court for the Northern District of California. Castle is also aware of this case, having caused three separate pieces of correspondence to be filed on the Court's docket on October 26, 2015, followed by a motion to dismiss the indictment filed on November 30, 2015.

## Part IV
### Description of Fugitive

49.     Castle is a United States citizen who was born in Sunnyvale, California on July 25, 1964. He is a Caucasian male who is approximately 6 feet and 1 inch (185 cm) tall and weighs approximately 200 pounds (91 kg). He has brown/gray hair and brown eyes. His last known home address is 93-97 Albatross Avenue, Mermaid Beach, Queensland, Australia. I have attached a photograph of Castle to this affidavit as **Exhibit 6**. Trites, who met Castle in person on approximately two dozen occasions during the scheme, has viewed this photograph and has identified the person depicted in the photograph as the person she knows as Christopher Castle.

## Part V
### Index to Exhibits and Certification

50.     I have attached the following documents and exhibits in support of this request for the extradition of James Christopher Castle:

A. **Exhibit 1** is a certified copy of the indictment;

B. **Exhibit 2** is a copy of Rule 9, Federal Rules of Criminal Procedure;

C. **Exhibit 3** is a certified copy of the arrest warrant;

D. **Exhibit 4** is a copy of the pertinent sections of the following statutes:

- Title 18, United States Code, § 371;
- Title 18, United States Code, § 493;
- Title 18, United States Code, §1344(1); and
- Title 18, United States Code, § 1957

E. **Exhibit 5** is a copy of Title 18, United States Code, §§ 3282(a) and 3293; and

1

F.  **Exhibit 6** is a photograph of James Christopher Castle.

2

### Conclusion

3

51.     I have thoroughly reviewed the prosecution's evidence against James Christopher Castle

4

and attest that this evidence is sufficient to establish that he is guilty of the offenses charged in the

5

indictment beyond a reasonable doubt.

6

Executed on 9th day of March,  2017, at Sacramento, California, United States of America.

7

8

PHILLIP A. TALBERT
United States.Attorney

9

10

AUDREY B. HEMESATH
Assistant United States Attorney
Office of the United States Attorney
501 I Street, Suite 10-100
Sacramento, California 95814

11

12

13

Signed and sworn to before me this 9th day of March 2017,
at Sacramento, California, in the Eastern District of California.

14

15

16

THE HONORABLE KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

1 | BENJAMIN B. WAGNER
United States Attorney
2 | AUDREY B. HEMESATH
Assistant United States Attorney
3 | 501 I Street, Suite 10-100
Sacramento, CA 95814
4 | Telephone: (916) 554-2700

5

6 | Attorneys for Plaintiff
United States of America

**ORIGINAL
FILED**

SEP 10 2015

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

# SEALED

7

8        IN THE UNITED STATES DISTRICT COURT

9        EASTERN DISTRICT OF CALIFORNIA

10 | UNITED STATES OF AMERICA,

11 |                           Plaintiff,

12 |                    v.

13 | JOHN MICHAEL DICHIARA,
JAMES CHRISTOPHER CASTLE,
14 | REMUS ALAN KIRKPATRICK,
LAURA MARIE PEZZI,
15 | GEORGE B. LARSEN,
LARRY TODT, and
16 | MICHAEL ROMANO,

17 |                           Defendants.

18

19

2̶1̶5 - CR - 0 1 9 0 GEB

CASE NO.

VIOLATIONS: 18 U.S.C. § 371 – Conspiracy;
18 U.S.C. § 493 - Bonds and Obligations of Certain
Lending Agencies (15 Counts); 18 U.S.C. § 1344(1) –
Bank Fraud (23 Counts); 18 U.S.C. § 1957 –
Monetary Transactions in Criminally Derived
Property (3 Counts); and 18 U.S.C. §§ 982(a)(1),
982(a)(2)(A), 18 U.S.C. § 492 and 28 U.S.C. §
2461(c) – Criminal Forfeiture

I hereby certify that the annexed
instrument is a true and correct copy of
the original on file in my office.
ATTEST: **MARIANNE MATHERLY**

Clerk, U.S. District Court
Eastern District of California

By

Deputy Clerk

Dated 9/23/15

20                    INDICTMENT

21 | COUNT ONE: [18 U.S.C. § 371 – Conspiracy]

22 |         The Grand Jury charges:

23 |                    JOHN MICHAEL DICHIARA,
24 |                    JAMES CHRISTOPHER CASTLE,
                       REMUS ALAN KIRKPATRICK,
25 |                    LAURA MARIE PEZZI,
                       GEORGE B. LARSEN,
26 |                    LARRY TODT, and
                       MICHAEL ROMANO,

27

28 | defendants herein, as follows:

INDICTMENT                           1

# I.   INTRODUCTION

At all times relevant to this indictment:

1.       The following entities were financial institutions as defined in Title 18 United States Code, Section 20: Countrywide, Washington Mutual, Fidelity Home Mortgage Company, America's Broker Conduit, M&T Mortgage Corporation, First Choice Funding, Wells Fargo (formerly known as World Savings Bank), HSBC Bank, World Savings Bank, Greenpoint Mortgage Funding, Valley Vista Mortgage, SCME Mortgage Bankers, Meridias Capital, Aegis Wholesale, JP Morgan Chase, Guild Mortgage, America's Wholesale Lender, United Pacific Mortgage, Wachovia Mortgage FSB, Paul Financial LLC, United Capital Funding Inc., FNMA/Freddit, Bank of America, Provident, Duxford Financial, OneWest Bank, IndyMac Bank, Deutsche Bank, Bank of NY Mellon, Aurora Loan Services, Quality Loan Service, Aldea Homes Inc., Nationstar Mortgage, Fannie Mae, US Bank, Ally Bank, RBS Citizens, Charter One Bank, Citibank, GMAC, Encore Credit, Liberty American Mortgage, PNC Bank (collectively "financial institutions").

2.       The defendant JOHN MICHAEL DICHIARA resided in Nevada County, in the State and Eastern District of California.

3.       DICHIARA named himself the archbishop of Shon-te-East-a, Walks With Spirit ("Shon-te-East"), a registered Utah corporation, with a business address at 228 Commercial Street #464 in Nevada City, California and elsewhere.  DICHIARA claimed that, as archbishop, he helped individuals spiritually by alleviating them from personal debt, namely, their mortgage loans.

4.       DICHIARA was also the self-named archbishop of the Pillow Foundation, a registered Utah corporation, with a business address in Reno, Nevada.  Both Shon-te-East and Pillow Foundation claimed to be tax exempt religious organizations under Section 508 of Title 26 of the United States Code (i.e., the Internal Revenue Code).  Neither Shon-te-East nor Pillow Foundation had a physical worship location.

5.       DICHIARA was the signatory on a Wells Fargo bank account located in the State and Eastern District of California, under the name God's Will Ministries Through Jesus Christ.  DICHIARA used this account to receive proceeds of the conspiracy.  DICHIARA was the signatory on a Bank of America bank account located in the State and Eastern District of California, under the name Penn

1  Valley, also used to receive proceeds of the conspiracy.

2      6.      The defendant JAMES CHRISTOPHER CASTLE was a co-owner of CCTT Group, an

3  unincorporated company dedicated to the "administrative default process" or "mortgage elimination

4  program."

5      7.      CCTT Group maintained a bank account, named CCTT Legal, at Bank of America in

6  South Lake Tahoe, California, in the State and Eastern District of California, for which CASTLE was a

7  signatory. CASTLE used this account to receive and disburse funds in furtherance of conspiracy.

8      8.      CASTLE was also the owner of Oreplex International, LLC, held out as a private lending

9  company. Oreplex maintained a bank account at Bank of America, for which CASTLE was a signatory.

10  CASTLE used this account to receive and disburse funds in furtherance of the conspiracy.

11      9.      CASTLE was also a co-owner of CJT Financial Group, also held out as a private lending

12  company. CJT Financial Group maintained a bank account at Bank of America, located in South Lake

13  Tahoe, in the State and Eastern District of California, for which CASTLE was a signatory. CASTLE

14  used this account to receive and disburse funds in furtherance of the conspiracy.

15      10.      The defendant REMUS ALAN KIRKPATRICK was the owner of Golden Hills Trust,

16  held out as a private lending company. Golden Hills Trust maintained a business bank account at Bank

17  of America, in the State and Eastern District of California, for which KIRKPATRICK was a signatory.

18  KIRKPATRICK used this account to receive and disburse funds in furtherance of the conspiracy.

19  Golden Hills Trust also maintained a bank account at Wells Fargo Bank, for which KIRKPATRICK was

20  a signatory. KIRKPATRICK used this account to receive and disburse funds in furtherance of the

21  conspiracy.

22      11.      The defendant LAURA MARIE PEZZI was a resident of the State and Eastern District of

23  California. PEZZI sold her own house through the "mortgage elimination program," and then began to

24  work out of her home as an administrator for KIRKPATRICK, managing the documents and document

25  templates used in furtherance of the conspiracy.

26      12.      The defendant GEORGE B. LARSEN was the owner of GJZ Group, held out as a private

27  lender. GJZ Group maintained a bank account at Bank of America, for which Larsen was a signatory.

28  Larsen used this account to receive and disburse funds in furtherance of the conspiracy.

INDICTMENT                                       3

1    13.    The defendant LARRY TODT was the owner of Envirotech Systems, LLC, held out as a

2  private lending company.  Envirotech Systems maintained a bank account at Bank of America, for

3  which TODT was a signatory.  TODT used this account to receive and disburse funds in furtherance of

4  the conspiracy.

5    14.    The defendant MICHAEL ROMANO was the holder of an expired real estate broker's

6  license with the California Department of Real Estate.  He recruited homeowners into the "mortgage

7  elimination program" and attempted to put his own residence through the program.

8                           **II.    THE CONSPIRACY**

9    15.    Beginning on or about April 22, 2010, and continuing through at least on or about

10  November 18, 2011, in the State and Eastern District of California and elsewhere, the defendants did

11  knowingly combine, conspire and agree with each other, and with others known and unknown to the

12  Grand Jury, to commit offenses against the United States of America, that is the false making of lending

13  association writings, in violation of Title 18, United States Code, Section 493, and bank fraud, in

14  violation of Title 18, United States Code Section 1344(1).

15                          **III.    MANNER AND MEANS**

16           The manner and means of the conspiracy included the following:

17    16.    The defendants attempted to and did perpetrate a scheme through an "administrative

18  default procedure" or "mortgage elimination program" in which they recruited distressed homeowners

19  with the promise of relief from foreclosure and the protection of a spiritual or charitable organization.

20  The defendants recorded or caused to be recorded sham deeds of trust on the properties toward the end

21  of deceiving escrow agents into paying defendants as the primary lienholders.  The defendants caused to

22  be falsely made and recorded deeds of reconveyance from mortgage lenders, incorrectly indicating that

23  the homeowner's mortgage loan had been repaid.  Defendants then caused the properties to be short-

24  sold.  The defendants sought to and did enrich themselves by receipt of the short sale proceeds.

25    17.    Between in or about April 2010 and in or about November 2011, defendants worked to

26  identify distressed homeowners who fit a certain profile: property value less than the amount owed to

27  the mortgage lender, and in danger of foreclosure, but foreclosure not quite imminent.

28    18.    A key component of the scheme was that homeowners were not given the option of

INDICTMENT                                    4

1 || remaining in their homes. The defendants required that each homeowner agree to sell the home to
2 || participate in their fraudulent "mortgage elimination program."

3 ||       19.      Homeowners were recruited at seminars held in Roseville, California; Petaluma,
4 || California; and elsewhere, in which CASTLE and DICHIARA explained the "administrative default
5 || procedure" or "mortgage elimination program." DICHIARA was introduced as the archbishop of the
6 || Shon-te-East church. CASTLE presented the mechanics of the "mortgage elimination program."

7 ||       20.      ROMANO and others known and unknown to the Grand Jury also recruited homeowners
8 || via word-of-mouth.

9 ||       21.      Homeowners were enticed with the promise of three things: an opportunity to avoid
10 || foreclosure and the resulting negative impact on their credit; a possible tax write-off when the home was
11 || ostensibly donated to the church; and some percentage of the sales proceeds, typically 20% of the short
12 || sale profit.

13 ||       22.      Homeowners committing to the program typically signed a contract with the individual
14 || who recruited them into the program and CASTLE. Homeowners also typically signed a membership
15 || application into the Shon-te-East church or the Pillow Foundation, among other documents.

16 ||       23.      DICHIARA and others typically required the homeowners to assign or convey their
17 || homes to Shon-te-East or the Pillow Foundation. This assignment gave the homeowners the impression
18 || they were making a charitable donation to a religious organization, toward the possible end of taking a
19 || tax deduction. The assignment also gave the defendants the assurance that once the defendants had
20 || fraudulently filed documents to purport to eliminate the preexisting lien(s) on the house, the homeowner
21 || would not sell the house to a third party and keep the proceeds. In some instances, the homeowners
22 || actually recorded a quitclaim deed (or equivalent document, depending on jurisdiction), deeding their
23 || interest in the house to Shon-te-East or Pillow Foundation. In other instances, the defendants simply
24 || maintained a copy of a notarized, fully executed assignment, the purpose of which was to give the
25 || homeowners the impression that Shon-te-East or Pillow Foundation now held the property. In certain
26 || instances, certain defendants also gave homeowners the misimpression that the quitclaim or assignment
27 || transferred to Shon-te-East or Pillow Foundation legal responsibility over the mortgage(s) on the
28 || property. In reality, responsibility to repay the loan(s) to the financial institution(s) remained with the

1 | homeowners at all times.

2 |     24.    In some instances, certain defendants directed homeowners to cease any payments to the
3 | financial institution(s) once the homeowners were enrolled in the program.

4 |     25.    DICHIARA, TODT, and others known and unknown to the Grand Jury then caused
5 | correspondence to be sent to the financial institution holding the mortgage. This correspondence was
6 | typically titled "Notice of Right to Cancel," "Notice of Revocation of Power of Attorney," and "Notice
7 | of Removal." The correspondence generally purported to challenge the validity of the home loan.
8 | Certain co-conspirators known and unknown to the Grand Jury notarized this correspondence, and
9 | certified that it was sent to the financial institutions via U.S. mail.

10 |     26.    In many instances, the financial institution holding the mortgage would reply, indicating
11 | that the correspondence had been received, reviewed, and the financial institution had determined that
12 | the loan was still valid, and the homeowner continued to be required to make monthly mortgage
13 | payments.

14 |     27.    Regardless of the content of the reply by the financial institution, DICHIARA in many
15 | instances created a "3rd Party Verified Affidavit of Nonresponse," claiming that the response of the
16 | financial institution was somehow unsatisfactory and there was some consequence thereto.

17 |     28.    Certain defendants then caused the creation and recording of a sham lien on the property.
18 | They identified a fictitious lender— typically CCTT, Golden Hills Trust, Envirotech, or GJZ—as the
19 | new lender on the property. They selected an arbitrary amount to fill in for the bogus new loan, always
20 | higher than the original, real loan amount, to give the illusion that the property had been refinanced. But
21 | in fact, the bogus lien did not secure any real loan and the homeowners understood that they owed no
22 | money to the fictitious lenders. Certain defendants caused the recording of the fraudulent deeds of trust
23 | reflecting these bogus liens at the office of the county recorder.

24 |     29.    Certain defendants were then responsible for the fraudulent reconveyance of the property
25 | from the financial institution(s) that actually held the mortgage. As part of the conspiracy, PEZZI and
26 | others created a fraudulent deed of reconveyance (or equivalent document, depending on jurisdiction).
27 | This document purported to extinguish the real lending institution's security interest in the subject
28 | property. PEZZI, LARSEN, TODT, and others known and unknown to the Grand Jury identified a real,

1    trusted person to sign the fraudulent deed of reconveyance as if the trusted person was an authorized

2    representative of the financial institution that actually held the mortgage.  The fraudulent deeds of

3    reconveyance were then recorded at the county recorder's office.  The fraudulent deeds were sent to the

4    purported beneficiary of the reconveyance from the recorder's office via U.S. mail.

5          30.    The financial institutions were unaware that the fraudulent deeds of reconveyance had

6    been recorded, because the mailing notification in most instances went directly to the homeowner.  In

7    addition, on some occasions, homeowners were instructed to or required to sign a confidentiality

8    agreement, keeping secret the mechanics of the "mortgage elimination program."

9          31.    In many instances, the financial institution(s) that actually held the mortgage recorded a

10   notice of default, marking the beginning of the foreclosure process.

11         32.    In many instances, certain defendants, made aware of the issuance of a notice of default,

12   caused to be recorded a fraudulent Notice of Rescission of Notice of Default.  As with the fraudulent

13   deeds of reconveyance, the notices of rescission of default were signed by real persons known to the

14   defendants who purported to be "authorized representatives" of the financial institution(s) that were

15   actually in the process of foreclosing on the home.  These notices of rescission were recorded and

16   typically sent to the homeowner via U.S. mail.  PEZZI maintained copies of the notices in her property

17   files.

18         33.    Certain defendants then located or caused others to locate buyers for the homes.  In most

19   instances, they looked for buyers who were able to purchase with cash, speeding the sale and reducing

20   the scrutiny of the sale by another lender.

21         34.    Once in escrow, certain defendants, holding themselves out as CCTT, GJZ, Envirotech,

22   Golden Hills Trust, and other fictitious lenders, acted as the lender who was purportedly still owed

23   money, and typically sent to the escrow agent a demand letter approving the short sale of the property.

24   The fictitious lender approved a short sale amount that was typically just a fraction of the bogus loan

25   amount stated in the fraudulent deed of trust recorded just a few months earlier.

26         35.    The result of the recorded fraudulent deeds of trust, fraudulent deeds of reconveyance,

27   and fraudulent notices of rescission of notice of default was to deceive the escrow agent and to make it

28   appear as though CCTT, GJZ Trust, Envirotech, Golden Hills Trust, and other fictitious lenders were the

1  primary lienholders on the property and the legitimate lenders had no valid security interest in the
2  property and did not need to be paid at closing.  Escrow agents therefore caused payments to CCTT,
3  GJZ Trust, Envirotech, Golden Hills Trust, and other fictitious lenders as part of these closings.

4          36.     KIRKPATRICK, CASTLE, and LARSEN and others known and unknown to the Grand
5  Jury received funds from the short-sale closings as the fictitious lender.

6          37.     KIRKPATRICK, TODT, DICHIARA, LARSEN and others then divided the sales
7  proceeds by distributing a share to each individual due a percentage per prior agreement with the
8  homeowner and others known and unknown to the Grand Jury.

9          38.     The defendants employed different variations of the "mortgage remedy program."  On at
10  least one occasion, the homeowner quitclaimed the property to Shon-te-East, and DICHIARA then sold
11  the property in the short sale.  On other occasions, Shon-te-East or Pillow Foundation quitclaimed the
12  property back to the homeowner, and the homeowner then sold the property at the direction of the
13  defendants.  On other occasions, the assignment to Shon-te-East or Pillow Foundation was not recorded,
14  and the homeowner sold the property in the short sale arranged by certain defendants.  On other
15  occasions, certain defendants caused the transfer of the property interest of the homeowners into family
16  trusts, with DICHIARA and others known and unknown to the Grand Jury as trustee.  But every time,
17  the scheme was executed by using a fraudulent deed of reconveyance that purported to extinguish the
18  real lender's security interest in the real property.

19          39.     The real liens on the property by the financial institutions were never satisfied by the
20  fraudulent short sale of the home.  In many instances, the financial institutions continued the foreclosure
21  process.  In many instances, the buyers of the homes became aware of the clouded title to the home for
22  the first time when the financial institutions attempted to foreclose on the properties after the fraudulent
23  short sale.

24          40.     In all, the defendants sold approximately 37 properties in furtherance of the conspiracy.
25  The sale proceeds totaled in excess of $8 million.  They put an additional approximately 97 properties
26  through some phase of the "mortgage elimination program," toward the end of eventual sale.  The stages
27  of completion ranged from simply filling out Shon-te-East or Pillow Foundation membership
28  documents, to the recording of one or more of the essential fraud documents (deed of trust, deed of

1   reconveyance, notice of rescission of default), to the seeking of a buyer in the short sale. The legitimate

2   loans the defendants sought to fraudulently extinguish totaled in excess of $60 million.

3                    IV.    **OVERT ACTS**

4           In furtherance of the conspiracy and to accomplish its objects, the defendants, and others known

5   and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among

6   others, within the Eastern District of California and elsewhere:

7       A. **319 Marsalla Drive, Folsom, California**

8           41.    In or about October 2010, PEZZI told Homeowner One, the owner of 319 Marsalla

9   Drive, Folsom, California, located in the State and Eastern District of California, that through the

10  "mortgage remedy process," Homeowner One's mortgage lender would be removed from title, and then

11  the house would be sold.

12          42.    On or about December 12, 2010, CASTLE and PEZZI signed a contract with

13  Homeowner One, agreeing to the terms of the arrangement. On or about December 29, 2010,

14  DICHIARA caused Homeowner One to submit a membership application to the Pillow Foundation.

15          43.    On or about December 22, 2010, KIRKPATRICK, CASTLE, DICHIARA and PEZZI

16  caused a bogus Deed of Trust to be recorded at the Sacramento County Recorder's Office, in the State

17  and Eastern District of California, falsely indicating that lender Golden Hills Trust loaned Homeowner

18  One $325,000, secured against the Marsalla Drive property. Homeowner One did not actually owe

19  Golden Hills Trust $325,000. The loan indicated in the Deed of Trust was fictitious. Homeowner One

20  never paid any mortgage or loan payments to Golden Hills Trust.

21          44.    KIRKPATRICK, CASTLE, DICHIARA, PEZZI and others known and unknown to the

22  Grand Jury falsely made or caused to be falsely made a Substitution of Trustee and Deed of

23  Reconveyance, which was then recorded at the Sacramento County Recorder's Office on or about

24  February 15, 2011. A person known to the Grand Jury and referred to herein as Associate One, signed

25  the document as an "authorized representative" of Wells Fargo Bank, formerly known as World Savings

26  Bank. The document purported to reconvey to Homeowner One all of the bank's interest in the

27  property, falsely stating that the mortgage debt had been fully paid. Associate One did not work for and

28  was not an authorized representative of Wells Fargo. Wells Fargo did not reconvey its interest in the

INDICTMENT                                    9

1 property to Homeowner One.

2       45.    On or about March 1, 2011, PEZZI signed and caused to be recorded a second

3 Substitution of Trustee and Deed of Reconveyance at the Sacramento County Recorder's Office. In the

4 document, PEZZI, an "authorized representative" of Wells Fargo Bank, formerly known as World

5 Savings Bank, purported to reconvey to Homeowner One all of the bank's interest in the property,

6 falsely stating that Homeowner One's home equity line of credit ("HELOC") had been fully paid. PEZZI

7 did not work for and was not an authorized representative of Wells Fargo. Wells Fargo did not reconvey

8 its interest in the property to Homeowner One.

9       46.    On or about June 1, 2011, KIRKPATRICK signed and caused to be recorded a third

10 Substitution of Trust and Deed of Reconveyance at the Sacramento County Recorder's Office. In the

11 document, KIRKPATRICK purported to substitute Golden Hills Trust as the trustee based on the Deed

12 of Trust signed by Homeowner One.

13       47.    In or about May 2011, KIRKPATRICK and CASTLE arranged for the sale of the

14 property, directing Homeowner One to enter into a residential short sale purchase agreement with a

15 buyer who agreed to buy Marsalla Drive for approximately $187,000.

16       48.    On or about May 26, 2011, KIRKPATRICK submitted a payoff demand to the escrow

17 agent instructing that (1) escrow must close before June 1, 2011; (2) the gross sales price was $187,000

18 and Golden Hills Trust would accept no less than $173,706.30; (3) the borrowers/sellers were not to

19 receive any cash funds from the sale transaction; and (4) the sale proceeds were to be wired into the

20 business account of Golden Hills Trust following the close of escrow.

21       49.    KIRKPATRICK provided wire instructions directing that the proceeds be wired directly

22 to Golden Hills Trust's Bank of America bank account located in South Lake Tahoe, California, in the

23 State and Eastern District of California. At the close of escrow, the wire in the amount of approximately

24 $173,824.55 was sent to the Golden Hills Group Bank of America bank account in South Lake Tahoe,

25 California on May 31, 2011.

26       50.    On or about June 3, 2011, KIRKPATRICK transferred approximately $59,696.71 out of

27 the Golden Hills Group Bank of America bank account to the CCTT Group Bank of America bank

28 account.

INDICTMENT                              10

51.     On or about June 6, 2011, there was a $17,100 transfer from the CCTT Group Bank of America bank account into a Bank of America bank account named IOC Group, to the benefit of CASTLE and DICHIARA.

**B.      28432 Avenida Placida, San Juan Capistrano, California**

52.     On or about March 22, 2010, CASTLE and TODT signed a contract with Homeowner Two, the owner of a home located at 28432 Avenida Placida in San Juan Capistrano, California, enrolling him in the "administrative default" program.

53.     On or about April 16, 2010, TODT, CASTLE, DICHIARA, and others known and unknown to the Grand Jury caused Homeowner Two to sign a Deed of Trust, which was recorded at the Orange County Recorder's Office. The Deed of Trust falsely indicated that Homeowner Two owed CCTT Group $1,100,000, secured against the Avenida Placida property.

54.     On or about April 21, 2010, TODT signed and recorded a Notice of Rescission of Notice of Default, purporting to cancel a notice of default earlier recorded by Washington Mutual. The recorded Notice of Rescission was sent via U.S. mail, purportedly to the California Reconveyance Company, but to the attention of TODT. TODT was not an "Authorized Representative" of the California Reconveyance Company, and was not authorized to rescind the notice of default.

55.     On or about April 28, 2010, TODT, CASTLE and DICHIARA caused to be falsely made and recorded a Substitution of Trustee and Deed of Reconveyance, purporting to reconvey JP Morgan Chase's interest in the property to Homeowner Two. That document stated that the indebtedness had been fully paid. The Deed of Reconveyance was signed by Associate Two as an "Authorized Representative" of JP Morgan Chase. Associate Two did not work for and was not an authorized representative of JP Morgan Chase. JP Morgan Chase did not reconvey its interest in the property to Homeowner Two.

56.     On or about July 6, 2010, DICHIARA caused Homeowner Two to assign his interest in 28432 Avenida Placida to Shon-te-East and DICHIARA. The Assignment was recorded at the Orange County Recorder's Office. A copy of the recorded Assignment was mailed to DICHIARA at the Shon-te-East business address in the State and Eastern District of California.

57.     On or about July 6, 2010, DICHIARA caused Homeowner Two to sign and record at the

1   Orange County Recorder's Office a Quit Claim Deed stating that he quitclaimed his interest in 28432

2   Avenida Placida to Shon-te-East.  A copy of the Quit Claim Deed was mailed to DICHIARA at the

3   Shon-te-East business address in the State and Eastern District of California.

4       58.     DICHIARA, TODT and CASTLE then caused the sale of the property.

5       59.     On or about August 25, 2010, DICHIARA, as the new "owner" of the Avenida Placida

6   property, sent a letter to the escrow company indicating that the property was to be sold to the buyer for

7   $900,000.

8       60.     On or about September 1, 2010, CASTLE sent a demand letter to the escrow company

9   requesting $765,000 via wire transfer to the CCTT Group bank account.

10      61.     On or about September 3, 2010, a $769,558.13 wire transfer was deposited into a CCTT

11  Group Bank of America Bank account.

12  **C.   1928 Sansone Drive, Santa Rosa, California**

13      62.     In or about May 2010, CASTLE and LARSEN convinced Homeowner Three, owner of a

14  home located at 1928 Sansone Drive in Santa Rosa, California to enroll in the "mortgage remedy

15  program."

16      63.     On or about May 24, 2010, LARSEN, CASTLE, and DICHIARA caused Homeowner

17  Three to sign and record a Deed of Trust falsely indicating that Homeowner Three owed GJZ Group

18  $425,000, secured against the Sansone Drive property.  In actuality, LARSEN and others known and

19  unknown to the Grand Jury told Homeowner Three that the loan was not real, and he would not have to

20  pay any portion of it.

21      64.     On or about June 2, 2010, DICHIARA caused Homeowner Three to sign and record a

22  Quit Claim Deed, transferring his interest in the property to Shon-te-East.  The Quit Claim Deed was

23  recorded in Sonoma County, and sent via U.S. mail to the business address for DICHIARA in the State

24  and Eastern District of California.

25      65.     On or about October 1, 2010, DICHIARA, CASTLE and LARSEN caused a Substitution

26  of Trustee and Deed of Reconveyance to be recorded, purporting to reconvey Bank of America's interest

27  in the Sansone Drive property as the debt had been fully repaid.  The Deed of Reconveyance was signed

28  by Associate Three, an "Authorized Representative."  Associate Three did not work for Bank of

1  America and was not an authorized representative.  Bank of America did not reconvey its interest in the

2  property to Homeowner Three.

3      66.    On or about October 1, 2010, DICHIARA, CASTLE and LARSEN caused a second

4  Substitution of Trustee and Deed of Reconveyance to be recorded, purporting to reconvey Chase Home

5  Finance's interest in the Sansone Drive property as the debt had been fully repaid.  The Deed of

6  Reconveyance was signed by Associate Four, an "Authorized Representative."  Associate Four did not

7  work for Chase and was not an authorized representative.  Chase did not reconvey its interest in the

8  property to Homeowner Three.

9      67.    On or about December 1, 2010, DICHIARA signed and recorded a Quit Claim Deed,

10  returning the interest in the property to Homeowner Three.

11      68.    DICHIARA, CASTLE and LARSEN then caused the sale of the property.

12      69.    On or about March 22, 2011, LARSEN sent to the escrow company a demand letter

13  requesting net proceeds to GJZ Group of no less than $90,000, to be wired into the GJZ bank account.

14      70.    On or about April 11, 2011, the escrow company sent $97,492.99 via wire transfer to the

15  GJZ Group bank account.

16  **D.    2126 Painted Pony Drive, Somerset, California**

17      71.    In or about November, 2010, ROMANO and another person known to the Grand Jury

18  referred to herein as Homeowner Four, owned a single family residence located at 2162 Painted Pony

19  Drive, Somerset, California, in the State and Eastern District of California, signed the membership

20  contract enrolling them in the "mortgage elimination program."  CASTLE and PEZZI signed as the

21  representatives of the CCTT Group.  ROMANO and Homeowner Five also submitted an application for

22  membership to the Pillow Foundation.

23      72.    ROMANO signed and had notarized a Quit Claim Deed, purporting to quitclaim his

24  interest in the property to the Pillow Foundation.  The recorded document was to be mailed to "trustee"

25  DICHIARA.

26      73.    On or about November 17, 2010, ROMANO, DICHIARA, CASTLE, KIRKPATRICK,

27  and PEZZI caused to be recorded a Deed of Trust at the El Dorado County Recorder's Office, in the

28  State and Eastern District of California, indicating that lender Golden Hills Trust loaned him $375,000,

INDICTMENT

13

1  secured against the Painted Pony Road property. ROMANO did not actually owe Golden Hills Trust

2  $375,000. The loan indicated in the deed of trust was fictitious. ROMANO never paid any mortgage or

3  loan payments to Golden Hills Trust.

4         74.     On or about February 14, 2011, ROMANO, DICHIARA, KIRKPATRICK, CASTLE,

5  and PEZZI caused to be falsely made and recorded a Substitution of Trustee at the El Dorado County

6  Recorder's Office.  On the document, Associate One, now purporting to be an "authorized

7  representative" of Mortgage Electronic Registration Systems, Inc., purports to substitute the trustee on

8  the original, real Deed of Trust and put in its place U.S. Bank NA.  Associate One did not work for and

9  was not an authorized representative of Mortgage Electronic Registration Systems.  Mortgage Electronic

10  Registration Systems did not substitute U.S. Bank as trustee on the original, real deed of trust.

11         75.     On or about February 14, 2011, ROMANO, DICHIARA, KIRKPATRICK, CASTLE,

12  and PEZZI caused to be falsely made and recorded a Full Reconveyance at the El Dorado County

13  Recorder's Office.  In the document, Associate Five, an "authorized representative" of U.S. Bank NA,

14  purports to reconvey to ROMANO and Homeowner Five all of its interest in the property.  Associate

15  Five did not work for and was not an authorized representative of U.S. Bank NA.  U.S. Bank NA did not

16  reconvey any interest in the property to ROMANO.

17         76.     On or about March 4, 2011, ROMANO, DICHIARA, KIRKPATRICK, CASTLE, and

18  PEZZI caused to be falsely made and recorded a Notice of Rescission of Notice of Default and Election

19  to Sell under Deed of Trust at the El Dorado County Recorder's Office, purporting to cancel a real

20  notice of default that had been filed by the real lender.  The document is signed by Associate Seven, an

21  "authorized representative" of National Default Servicing Corporation.  Associate Seven did not work

22  for and was not an authorized representative of National Default Servicing Corporation.  National

23  Default Servicing Corporation did not cancel the notice of default.

24         77.     The fraudulent Reconveyance was sent by the Recorder's Office, via U.S. mail, to PEZZI

25  purportedly as a representative of the National Default Servicing Corporation.  PEZZI was not a

26  representative of, nor did she work for, the National Default Servicing Corporation.

27         All in violation of Title 18, United States Code, Sections 371, 493, and 1344.

28

INDICTMENT                                        14

<u>COUNTS TWO THROUGH SIXTEEN</u>: [18 U.S.C. § 493 – Bonds and Obligations of Certain Lending Agencies]

The Grand Jury further charges:

JOHN MICHAEL DICHIARA,
JAMES CHRISTOPHER CASTLE,
REMUS ALAN KIRKPATRICK,
LAURA MARIE PEZZI, and
MICHAEL ROMANO

defendants herein, as follows:

78.    The allegations set forth in Count One at Paragraphs 1 through 14 and Paragraphs 16 through 40 are incorporated by reference as though set forth herein.

79.    The following entities are and were at all relevant times, lending associations authorized or acting under the laws of the United States, mortgage loan corporations, insured credit unions, or intermediate credit banks:  Wells Fargo, N.A., formerly known as World Savings Bank; M&T Bank; Charter One Bank; Washington Mutual; Fidelity; Countrywide; Travis Credit Union; Chase; Liberty America Mortgage;  American Mortgage Partners; and U.S. Bank.

80.    On or about each date set forth below, in the State and Eastern District of California, and elsewhere, the defendants identified and charged as set forth below, did falsely make the following writings in imitation of a writing issued by a land bank, intermediate credit bank, insured credit union, lending, mortgage, insurance, credit or savings and loan corporation or association; and did pass and utter the following writings knowing them to have been falsely made:

| Count | Property | False Writings | Place of Filing | Date | Defendant(s) |
|---|---|---|---|---|---|
| 2 | 3182 Shawnee Court, Cameron Park, California | Substitution of Trustee and Deed of Reconveyance | El Dorado County | December 3, 2010 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI |
| 3 | 3182 Shawnee Court, Cameron Park, California | Substitution of Trustee and Deed of Reconveyance | El Dorado County | December 2, 2010 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI |
| 4 | 319 Marsalla Drive, Sacramento, California | Substitution of Trustee and Deed of Reconveyance | Sacramento County | February 15, 2011 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI |

| | | | | | |
|---|---|---|---|---|---|
| 5 | 319 Marsalla Drive, Sacramento, California | Substitution of Trustee and Deed of Reconveyance | Sacramento County | March 1, 2011 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI |
| 6 | 6303 Green Garden Drive, Bakersfield, California | Substitution of Trustee and Deed of Reconveyance | Kern County | October 4, 2010 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI |
| 7 | 6303 Green Garden Drive, Bakersfield, California | Substitution of Trustee and Deed of Reconveyance | Kern County | September 30, 2010 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI |
| 8 | 1420 Roaring Camp Court, Plumas Lake, California | Substitution of Trustee and Deed of Reconveyance | Yuba County | December 22, 2010 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI |
| 9 | 7593 Almondwood Avenue, Citrus Heights, California | Substitution of Trustee and Deed of Reconveyance | Sacramento County | October 20, 2010 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI |
| 10 | 5479 Dunlay Drive, Sacramento, California | Substitution of Trustee and Deed of Reconveyance | Sacramento County | September 21, 2010 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI |
| 11 | 7233 Cromwell Drive, Sacramento, California | Notice of Rescission of Notice of Default | Sacramento | October 14, 2010 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI |
| 12 | 7233 Cromwell Drive, Sacramento, California | Substitution of Trustee and Deed of Reconveyance | Sacramento | October 14, 2010 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI |
| 13 | 7233 Cromwell Drive, Sacramento, California | Substitution of Trustee and Deed of Reconveyance | Sacramento | October 15, 2010 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI |
| 14 | 2162 Painted Pony Road, Somerset, California | Substitution of Trustee | El Dorado County | February 14, 2011 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI, ROMANO |
| 15 | 2162 Painted Pony Road, Somerset, California | Full Reconveyance | El Dorado County | February 14, 2011 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI, ROMANO |

INDICTMENT

16

| 16 | 2162 Painted Pony Road, Somerset, California | Notice of Rescission of Notice of Default and Election to Sell Under Deed of Trust | El Dorado County | March 4, 2011 | DICHIARA, CASTLE, KIRKPATRICK, PEZZI, ROMANO |
|----|----|----|----|----|----|

All in violation of Title 18, United States Code, Sections 2 and 493.

COUNTS SEVENTEEN THROUGH THIRTY-NINE : [18 U.S.C. §§ 1344(1) – Bank Fraud]

The Grand Jury further charges:

JOHN MICHAEL DICHIARA,
JAMES CHRISTOPHER CASTLE,
REMUS ALAN KIRKPATRICK,
GEORGE B. LARSEN, and
LARRY TODT,

defendants herein, as follows:

81.     The allegations set forth in Count One at Paragraphs 1 through 14 and Paragraphs 16 through 40 are incorporated by reference as though set forth herein.

82.     The defendants named and identified in each count below, on the date specified below, in the State and Eastern District of California and elsewhere, did knowingly execute a material scheme to defraud at least one financial institution, with the intent to deceive and cheat the financial institution.

83.     The purpose of the scheme was to extinguish the secured interest owned by the financial institutions listed below on the borrower's property listed below, by recording false and fraudulent deeds of reconveyance at the county recorder's office purportedly on behalf of the financial institution to purportedly reconvey the financial institution's secured interest in the borrower's property without authority and permission to do so:

///
///
///
///

| Count | Borrower's Property | Secured Interest/Loan Amount | Financial Institution | Place and Approximate Date of Recording of Deed of Reconveyance | Defendant(s) |
|---|---|---|---|---|---|
| 17 | 319 Marsalla Drive, Folsom, California | $311,500 | World Savings Bank/Wells Fargo | Sacramento County, 2/15/11 | KIRKPATRICK, CASTLE, DICHIARA |
| 18 | 319 Marsalla Drive, Folsom, California | $20,000 | World Savings Bank/Wells Fargo | Sacramento County, 3/1/11 | KIRKPATRICK, CASTLE, DICHIARA |
| 19 | 1928 Sansone Drive, Santa Rosa, California | $308,000 | Bank of America | Sonoma County, 10/1/10 | DICHIARA, CASTLE, LARSEN |
| 20 | 1928 Sansone Drive, Santa Rosa, California | $77,000 | JP Morgan Chase | Sonoma County, 10/1/10 | DICHIARA, CASTLE, LARSEN |
| 21 | 6303 Green Garden Drive, Bakersfield, California | $300,000 | M&T Mortgage/Bank of America | Kern County, 10/4/10 | KIRKPATRICK, DICHIARA, CASTLE |
| 22 | 6303 Green Garden Drive, Bakersfield, California | $95,000 | RBS Citizens/Charter One Bank | Kern County, 9/30/10 | KIRKPATRICK, DICHIARA, CASTLE |
| 23 | 564 Stone Drive, Novato, California | $767,200 | Bank of America | Marin County, 2/18/11 | LARSEN, DICHIARA, CASTLE |
| 24 | 564 Stone Drive, Novato, California | $100,000 | Citibank | Marin County, 2/18/11 | LARSEN, DICHIARA, CASTLE |
| 25 | 4137 Loch Dane Court, Antelope, California | $360,000 | GMAC/SCME Mortgage Bankers/Aurora Loan Services | Sacramento County, 4/22/10 | CASTLE, DICHIARA |
| 26 | 1420 Roaring Camp Court, Olivehurst, California | $275,000 | Fidelity Home Mortgage/Bank of America | Yuba County, 12/22/10 | CASTLE, DICHIARA |

INDICTMENT

18

| 27 | 3182 Shawnee Court, Cameron Park, California | $314,625 | Wells Fargo | El Dorado County, 12/3/10 | DICHIARA, KIRKPATRICK |
|---|---|---|---|---|---|
| 28 | 3182 Shawnee Court, Cameron Park, California | $104,875 | Wells Fargo | El Dorado County, 12/2/10 | DICHIARA, KIRKPATRICK |
| 29 | 7233 Cromwell Way, Sacramento, California | $301,500 | Encore Credit/Chase Bank | Sacramento County, 10/14/10 | CASTLE, DICHIARA, KIRKPATRICK |
| 30 | 7233 Cromwell Way, Sacramento, California | $59,000 | Liberty American Mortgage/HSBC Bank | Sacramento County, 10/15/10 | CASTLE, DICHIARA, KIRKPATRICK |
| 31 | 28432 Avenida Placida, San Juan Capistrano, California | $999,000 | JP Morgan Chase (formerly Washington Mutual) | Orange County, 4/28/10 | TODT, CASTLE, DICHIARA |
| 32 | 21029 Justco Lane, Castro Valley, California | $528,000 | SCME Mortgage Bankers | Alameda County, 3/25/11 | LARSEN, DICHIARA, CASTLE |
| 33 | 60 Canyon Drive, Fairfax, California | $574,000 | Deutsche Bank/ PNC Bank | Marin County, 3/22/11 | LARSEN, CASTLE, DICHIARA |
| 34 | 7593 Almondwood Avenue, Citrus Heights, California | $240,500 | JP Morgan Chase | Sacramento County, 10/20/10 | DICHIARA, KIRKPATRICK, CASTLE |
| 35 | 3765 Northcrest Court, Simi Valley, California | $444,000 | United Capital Funding/Bank of America | Ventura County, 1/19/11 | CASTLE, DICHIARA |

INDICTMENT

19

| 36 | 3765 Northcrest Court, Simi Valley, California | $27,750 | Bank of America | Ventura County, 1/19/11 | CASTLE, DICHIARA |
| 37 | 5479 Dunlay Drive, Sacramento, California | $396,000 | Deutsche Bank/Bank of America/ Countrywide | Sacramento County, 9/21/10 | CASTLE, DICHIARA, KIRKPATRICK |
| 38 | 154 Brook Court, Branson, Missouri | $161,029 | JP Morgan Chase/First Choice Funding | Taney County, 1/18/11 | DICHIARA, CASTLE, KIRKPATRICK |
| 39 | 1794 Kodiak Circle, Reno, Nevada | $452,800 | World Savings/Wachovia | Washoe County, 5/20/11 | KIRKPATRICK, DICHIARA, CASTLE |

All in violation of Title 18, United States Code, Sections 2 and 1344(1).

COUNTS FORTY THROUGH FORTY TWO: [18 U.S.C. § 1957 – Transactions in Criminally Derived Property]

The Grand Jury further charges:

JOHN MICHAEL DICHIARA,
JAMES CHRISTOPHER CASTLE, and
REMUS ALAN KIRKPATRICK,

defendants herein, as follows:

84.    The allegations set forth in Count One at Paragraphs 1 through 14 and Paragraphs 16 through 40 are incorporated by reference as though set forth herein.

85.    On or about the dates set forth below, in the State and Eastern District of California, each defendant identified below, did knowingly engage in the corresponding monetary transaction set forth below, each of which was by, through, and to a financial institution affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity:

///

///

INDICTMENT

20

| Count | Property | Monetary Transaction | Defendant(s) |
|---|---|---|---|
| 40 | 1794 Kodiak Circle, Reno, Nevada | $12,500 cash withdrawal from Penn Valley Bank of America bank account # ....3452, on or about June 22, 2011 | DICHIARA |
| 41 | 1794 Kodiak Circle, Reno, Nevada | Purchase of $100,000 Bank of America cashier's check #432395480 on or about June 16, 2011 | KIRKPATRICK |
| 42 | 21029 Justco Lane, Castro Valley, California | Purchase of $20,000 Bank of America cashier's check #432010121 payable to J. Christopher Castle Irrevocable Trust, on or about June 14, 2011 | CASTLE |

All in violation of Title 18, United States Code, Sections 2 and 1957.

FORFEITURE ALLEGATION: [18 U.S.C. § 982(a)(1), (a)(2)(A), 18 U.S.C. § 492 and 28 U.S.C. § 2461(c) – Criminal Forfeiture]

      1.      Upon conviction of one or more of the offenses alleged in Count One and Counts Seventeen through Thirty-Nine of this Indictment, defendants JOHN MICHAEL DICHIARA, JAMES CHRISTOPHER CASTLE,REMUS ALAN KIRKPATRICK,LAURA MARIE PEZZI,GEORGE B. LARSEN,LARRY TODT, and MICHAEL ROMANO shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting or derived from proceeds obtained directly or indirectly, as a result of said violations, including, but not limited to, the following:

      a)      A sum of money equal to the amount of proceeds obtained directly or indirectly, as a result of such offenses, for which defendants are convicted.

      2.      Upon conviction of one or more of the offenses alleged in Counts Two through Sixteen of this Indictment, defendants JOHN MICHAEL DICHIARA, JAMES CHRISTOPHER CASTLE,REMUS ALAN KIRKPATRICK, and LAURA MARIE PEZZI, and MICHAEL ROMANO shall forfeit to the United States pursuant to 18 U.S.C. § 492 and 28 U.S.C. § 2461(c), all property, real and personal, which constitutes or is derived from proceeds traceable to such violations, including but not limited to, a sum of money equal to the total of money involved in the offenses, for which the defendant is convicted.

INDICTMENT

21

1       3.      Upon conviction of the offenses alleged in Counts Thirty-Seven through Thirty-Nine of

2   this Indictment, defendants JOHN MICHAEL DICHIARA, JAMES CHRISTOPHER CASTLE, and

3   REMUS ALAN KIRKPATRICK shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), all

4   property, real or personal, involved in such violation, and any property traceable to such property,

5   including but not limited to the following:

6           a.      A sum of money equal to the amount of money involved in the offense, for which

7   defendants are convicted.

8       4.      If any property subject to forfeiture, as a result of the offenses alleged in Count One

9   through Forty Two of this Indictment, for which defendants are convicted:

10          a.      cannot be located upon the exercise of due diligence;

11          b.      has been transferred or sold to, or deposited with, a third party;

12          c.      has been placed beyond the jurisdiction of the Court;

13          d.      has been substantially diminished in value; or

14          e.      has been commingled with other property which cannot be divided without

15                  difficulty;

16  it is the intent of the United States, pursuant to 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c),

17  incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of defendants, up to the value

18  of the property subject to forfeiture.

19                                                      A TRUE BILL.

20

21                                                  /s/ Signature on file w/AUSA

22                                                FOREPERSON

23  BENJAMIN B. WAGNER

24  United States Attorney

25

26

27

28

EXHIBIT 2

## Federal Rules of Criminal Procedure

### Rule 9.  Arrest Warrant or Summons on an Indictment or Information

(a) Issuance. The court must issue a warrant—or at the government's request, a summons—for each defendant named in an indictment or named in an information if one or more affidavits accompanying the information establish probable cause to believe that an offense has been committed and that the defendant committed it. The court may issue more than one warrant or summons for the same defendant. If a defendant fails to appear in response to a summons, the court may, and upon request of an attorney for the government must, issue a warrant. The court must issue the arrest warrant to an officer authorized to execute it or the summons to a person authorized to serve it.

(b) Form.

> (1) Warrant. The warrant must conform to Rule 4(b)(1) except that it must be signed by the clerk and must describe the offense charged in the indictment or information.

> (2) Summons. The summons must be in the same form as a warrant except that it must require the defendant to appear before the court at a stated time and place.

(c) Execution or Service; Return; Initial Appearance.

> (1) Execution or Service.

>> (A) The warrant must be executed or the summons served as provided in Rule 4(c)(1), (2), and (3).

>> (B) The officer executing the warrant must proceed in accordance with Rule 5(a)(1).

> (2) Return. A warrant or summons must be returned in accordance with Rule 4(c)(4).

> (3) Initial Appearance. When an arrested or summoned defendant first appears before the court, the judge must proceed under Rule 5.

(d) Warrant by Telephone or Other Means. In accordance with Rule 4.1, a magistrate judge may issue an arrest warrant or summons based on information communicated by telephone or other reliable electronic means.

EXHIBIT 3

AO 442 (Rev. 11/11) Arrest Warrant
Case 2:15-cr-00190-GEB *SEALED*   Document 6 *SEALED* (Court only)   Filed 09/11/15
Page 1 of 1

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**SEALED**

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 2:15-cr-0190-GEB-2 |
| James Christopher Castle | ) |
| | ) |
| | ) |
| Defendant | ) |

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*      James Christopher Castle

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment      ☐ Superseding Indictment      ☐ Information      ☐ Superseding Information      ☐ Complaint
☐ Probation Violation Petition      ☐ Supervised Release Violation Petition      ☐ Violation Notice      ☐ Order of the Court

This offense is briefly described as follows:

18 USC 371 - Conspiracy
18 USC 493 - Bonds and Obligations of Certain Lending Agencies
18 USC 1344(1) - Bank Fraud
18 USC 1957 - Transactions in Criminally Derived Property

Date:      09/11/2015

/s/ Kimberly Zignago

*Issuing officer's signature*

City and state:      Sacramento, CA

K. Zignago, Deputy Clerk

*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ <br> at *(city and state)* _____ <br> Date: _____ |

I hereby certify that the annexed
instrument is a true and correct copy of
the original on file in my office.
ATTEST: MARIANNE MATHERLY
Clerk, U. S. District Court
Eastern District of California
By_____ Deputy Clerk
Dated 9-23-15

*Arresting officer's signature*

*Printed name and title*

EXHIBIT 4

**Title 18, United States Code, Section 1344 – Bank fraud**

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

   (1)  to defraud a financial institution; . . .

shall be… imprisoned not more than 30 years…

**Title 18, United States Code, Section 371 - Conspiracy**

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be … imprisoned not more than five years …

**Title 18, United States Code, Section 493 - Laundering of monetary instruments**

Whoever falsely makes, forges . . . any obligation, instrument, or writing in imitation or purporting to be in imitation of, a . . . obligation, instrument or writing, issued by . . . any land bank, intermediate credit bank, insured credit union, bank for cooperatives or any lending, mortgage, insurance, credit or savings and loan corporation or association authorized or acting under the laws of the United States, shall be … imprisoned not more than 10 years …

Whoever passes, utters, or publishes, or attempts to pass, utter or publish any note, bond, debenture, coupon, obligation, instrument or document knowing the same to have been falsely made, forged, counterfeited or altered, contrary to the provisions of this section, shall be … imprisoned not more than 10 years …

**Title 18, United States Code, Section 1957 – Money Laundering**

(a)   Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

(b)

      (1)   Except as provided in paragraph (2), the punishment for an offense under this section is … imprisonment for not more than ten years . . . .

(c)   In a prosecution for an offense under this section, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity.

(d)   The circumstances referred to in subsection (a) are—

      (1)   that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States . . . .

(f)   As used in this section—

      (1)   the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title, but such term does not include any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution;

      (2)   the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and

      (3)   the terms "specified unlawful activity" and "proceeds" shall have the meaning given those terms in section 1956 of this title.

EXHIBIT 5

**Title 18, United States Code, Section 3282 – Offenses not capital**

(a) In General.—

Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed. . . .

**Title 18, United States Code, Section 3293 – Financial institution offenses**

No person shall be prosecuted, tried, or punished for a violation of, or a conspiracy to violate—

…

(2) section 1341 or 1343, if the offense affects a financial institution; or

…

unless the indictment is returned or the information is filed within 10 years after the commission of the offense.

EXHIBIT 6

